UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAMUEL AMBROSE,

                Petitioner,                Case No. 08-12502

v                                    Honorable Thomas L. Ludington

KENNETH ROMANOWSKI,

                Respondent.

_____/

**OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION, DENYING PETITIONER'S MOTION FOR SUMMARY JUDGMENT, BUT GRANTING IN PART A CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Petitioner Samuel Ambrose, a state prisoner at Bellamy Creek Correctional Facility in Ionia, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted of second-degree murder in the former Recorder's Court for the City of Detroit, Michigan and sentenced to life imprisonment. He asserts eleven claims for relief. Respondent Kenneth Romanowski urges the Court to deny the petition on grounds that Petitioner's claims are noncognizable, procedurally defaulted, or meritless. Having reviewed the pleadings and record, the Court finds that Petitioner's claims do not warrant habeas relief. Accordingly, the petition and motion for summary judgment will be denied.

I.

A.

It is undisputed that Petitioner gravely injured Kenneth Brown outside a Detroit bar on April 17, 1979, at about 1:00 a.m. Petitioner was taken into custody the same night, but released the next day.

On May 2, 1979, Mr. Brown died from his injuries.  The medical examiner determined that the cause of death was multiple blunt force injuries to the left side of the neck and left side of the head with contusions of the brain and bleeding.

On May 3, 1979, a "reverse writ" of habeas corpus was issued by Judge Robert VanWiemeersch.[1]  The next day, Petitioner was arraigned on a charge of second-degree murder, Mich. Comp. Laws § 750.317.  He was tried in Recorder's Court in November 1979.  His theory of the case was that he acted in self-defense.  He asserted that, because the victim had previously robbed him at gunpoint, he feared for his safety and was merely defending himself on the night in question. The prosecution's theory was that Petitioner beat the victim to death, using his hands and feet, after the victim was no longer able to resist.

Four eyewitnesses testified at Petitioner's trial.  The first witness, Marvin Smith, was an acquaintance of Petitioner's.  Mr. Smith testified that he saw Petitioner watching the victim as the victim talked to a woman. Trial Tr. Vol. II, 186–219, Nov. 16, 1979. When the victim completed his conversation, Petitioner approached him.  The victim then pushed Petitioner's arm, and Petitioner responded by hitting the victim and knocking him to the ground.  While the victim lay immobile on the ground, Petitioner hit him three or four more times on the head and kicked him in the neck.

A second witness, Kenneth Ferguson, similarly testified that he saw Petitioner approach Mr. Brown, strike him, knock him to the ground, kick him in the ribs, and then stomp on his chest with both feet.  *Id*. at 220–25.  After the assault ended, Mr. Ferguson approached the victim.  He recounted at trial that:

---

[1]"The reverse writ proceeding is informal and without any documentation.  It is the local police method of seeking judicial approval for extended detention of an arrestee without benefit of a warrant."  *People v. Johnson*, 271 N.W.2d 177, 178 n. 5 (Mich. Ct. App. 1978).

> [He] was bleeding from the mouth. I remember it was all red. You could barely see teeth. I thought maybe he would be swallowing those. He was bleeding from both nostrils and at least his left ear. The blood had trickled from the inner ear on out, down the lobe and onto the neck.

*Id*. at 226. Checking the victim's vitals, Mr. Ferguson did not hear signs of life:

> I listened to hear air passage or didn't hear—I remember I didn't hear a heartbeat. I lifted the man's eyelid. His eyes had rolled back into his head. He was lying back. There was no—there was no response from his pupils at the time . . . . And then the EMS came and then the police officers, and I yelled into his ear to see if that would get any response to him. Nothing. I screamed.

*Id*.

A third witness, Oliver Flowers, testified that he was a good friend of Petitioner and had been drinking with Petitioner before the incident. *Id*. at 233–34. After the two men left the bar, Mr. Flowers saw the victim approach Petitioner and begin to argue. *Id*. at 239. The victim then grabbed Petitioner. Mr. Flowers recounted that: "They were still arguing. [Petitioner] was pulling away from his grip . . . . He wouldn't let go, so [Petitioner] hit him . . . on the chin." *Id*. at 240. The blow knocked the victim to the ground, where he lay immobile. *Id*. at 241. Petitioner then began to curse the victim, hit him in the face, and kick him in the chest. *Id*. at 242. "I went to grab him," Mr. Flowers recalled, "and [Petitioner] pushed me away . . . . He went back to [the victim]" and continued to hit and kick him. *Id*. at 243-44.

Mr. Flowers went into the bar for help, and Petitioner eventually stopped the assault. *Id*. at 244–46. A short time later, the police arrested him at a nearby restaurant. *Id*. at 265–66.

A fourth witness, Jean Matthews, testified that she was the common law wife of the victim. Trial Tr. Vol. III, 277–78, Nov. 19, 1979. She was talking to the victim outside the bar immediately before the assault began. *Id*. at 279. The victim went back in the bar, she recalled, and as he left the bar, Petitioner hit him with a cane. The blow knocked the victim to the ground. *Id*. at 280–82. While he lay motionless, Ms. Matthews testified, "[Petitioner] just kept punching

- 3 -

him in the face, and then he would kick him in his face and his head, you know, just kept doing it, and jumping up in his head and his neck." *Id*. at 284.

Petitioner also provided his own version of events at trial. He explained that the victim had robbed him at gunpoint two years earlier. *Id*. at 323. When Petitioner left the bar in the early morning hours of April 17, 1979, the victim again accosted him. "Give me some money," Petitioner recalled the victim demanding. Continuing, Petitioner claimed that:

> The answer came out of my mouth, "No," and he went towards his waistband and I hit him . . . . He went out and  . . . when his arm was on my wrist, his hand, the pull from that and he was still trying to get what was down by his waistband, and I went to hit him and I hit him about three or four times. I kicked him several times.

*Id*. at 325–26. Explaining his actions, Petitioner testified that the victim

> led me to believe that he had a weapon, a gun or a knife . . . . I didn't have no intention of killing him. I just wanted him to leave me alone and don't bother me . . . . All I was trying to do was defend myself.

*Id*. at 326, 328.

The trial court instructed the jury on second-degree murder and on manslaughter as a lesser-included offense. On November 20, 1979, the jury found Petitioner guilty, as charged, of second-degree murder. Although it was Petitioner's first conviction, the judge sentenced him to life imprisonment.

## B.

For the next twenty-nine years, Petitioner challenged his conviction through various motions and appeals in state court. His challenges began with a direct appeal of right in the Michigan Court of Appeals, where he asserted errors in the jury instructions and evidence. In 1981, two members of a three-judge panel affirmed Petitioner's convictions and sentence. *See*

*People v. Ambrose*, No. 49968 (Mich. Ct. App. Sept. 29, 1981) (unpublished).[2]  Petitioner then

applied for leave to appeal in the Michigan Supreme Court, raising the same claims that he raised

in the court of appeals.  The Michigan Supreme Court denied Petitioner's application because it

was not persuaded to review the issues.  *See People v. Ambrose*, No. 69098 (Mich. Sup. Ct. May

17, 1983) (unpublished).

Next, Petitioner filed a petition for writ of habeas corpus in state court.  On April 23,

1987, Jackson County Circuit Judge Russell E. Noble denied the petition.  *See In re Ambrose*,

No. 87–44400–AH (Jackson Cnty. Cir. Ct., Apr. 23, 1987) (unpublished). Petitioner then filed a

complaint for habeas corpus in the Michigan Court of Appeals, which dismissed the complaint

for lack of merit in the grounds presented.  *See Ambrose v. Jackson Prison Warden*, No. 100550

(Mich. Ct. App. Aug. 26, 1987) (unpublished).  Petitioner's delayed application for leave to

appeal in the Michigan Supreme Court was denied because the court was not persuaded to

review the issues.  *See Ambrose v. Jackson Prison Warden*, No. 81735 (Mich. Feb. 29, 1988)

(unpublished).[3] On May 31, 1988, the Michigan Supreme Court denied Petitioner's motion for

reconsideration.

In 1994, Petitioner filed a motion for relief from judgment, which the trial court denied

on September 1, 1994.  In 1996, Petitioner filed another motion for relief from judgment in

Recorder's Court.  In an order dated September 3, 1996, Recorder's Court Judge Bruce Morrow

denied the motion without entering an opinion.  *See People v. Ambrose*, No. 79–002765–01

---

[2] Judge Dorothy Comstock Riley filed a dissenting opinion in which she concluded that the trial judge committed reversible error by conditioning the jury's consideration of the lesser-included offense of manslaughter on a finding that Petitioner was not guilty of the principal charge of second-degree murder.  Judge Riley determined that the remaining issues lacked merit or did not need to be addressed.

[3] Then-Chief Justice Dorothy Comstock Riley did not participate in the decision.

(Recorder's Ct., Sept. 3, 1996) (unpublished). Judge Morrow also sent a letter to Petitioner along with his motion explaining that it would not be considered.[1] Petitioner attempted to appeal Judge Morrow's decision, but the Michigan Court of Appeals dismissed the appeal without prejudice "for failure to pursue the case in conformity with the rules." *Ambrose v. Rec's Ct. Judge*, No. 198854 (Mich. Ct. App. Nov. 4, 1997) (unpublished).

Petitioner then filed a complaint for superintending control in the Michigan Supreme Court. The Michigan Supreme Court treated the complaint as a delayed application for leave to appeal, but nevertheless said that

> [d]enial should not be construed as approving the trial court's refusal to consider the motion for relief from judgment because defendant Ambrose had previously filed such a motion. Under MCR 6.502(G)(1), a criminal defendant may file one motion for relief from judgment after August 1, 1995, notwithstanding the defendant's having filed one or more such motions before that date.

*Ambrose v. Rec's Ct. Judge*, 587 N.W.2d 282 (Mich. 1998) (table). The Michigan Supreme Court ultimately denied Petitioner's motion.

In 1998, Petitioner filed still another motion for relief from judgment, and in 2005, he moved to amend his motion. Judge Morrow then denied the motion without explanation. *See People v. Ambrose*, No. 79–02765 (Mich. 3d Jud. Cir. Ct., Jan. 26, 2006) (unpublished). Petitioner appealed Judge Morrow's decision, but the Michigan Court of Appeals denied leave to appeal "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Ambrose*, No. 275571 (Mich. Ct. App. June 18, 2007) (unpublished). On December 28, 2007, the Michigan Supreme Court denied leave to appeal for the same reason. *See People v. Ambrose*, 742 N.W.2d 368 (Mich. 2007) (table). On March 24, 2008, the Michigan Supreme

---

[1] Although Judge Morrow's decision was styled as a denial of a "successive motion for relief of judgment," Judge Morrow's letter was also consistent with Michigan Court Rule 6.508, which provides that an insufficient motion is to be "returned to the defendant with a statement of the reasons for its return." While denial of a successive motion for relief of judgment is a procedural ruling, denial of a motion pursuant to Mich. Ct. Rule 6.508 may be for procedural concerns or for substantive issues.

Court denied Petitioner's motion for reconsideration from that decision. *See People v. Ambrose*, 745 N.W.2d 795 (Mich. 2008) (table).

C.

In June 2008, Petitioner filed his pro se petition for a writ of habeas corpus in this Court, raising twelve claims. Respondent moved for summary judgment, arguing that Petitioner's habeas petition was time-barred under 28 U.S.C. § 2244(d). The Court agreed, finding that Petitioner had one year from April 24, 1996, to file his habeas petition, and granted Respondent's motion after concluding that the petition was untimely. ECF No. 19. Petitioner appealed, and on February 10, 2011, the Sixth Circuit determined in a written opinion that the State must submit the pertinent records on Petitioner's 1996 motion for relief from judgment if the State was to carry its affirmative burden of demonstrating that the limitations period expired. The Sixth Circuit added: "Even if the state can show that the limitations period otherwise lapsed in this case, Ambrose may be able to respond with a colorable showing that equitable tolling should apply given the state trial court's improper refusal to consider his 1996 motion." *Ambrose v. Romanowski*, No. 09-1937 (6th Cir. Feb. 10, 2011). The Sixth Circuit then vacated this Court's judgment and remanded the case for further proceedings without addressing which, if any, of the issues remained subject to habeas review.

On remand, Respondent conceded that Petitioner's 1996 motion may have tolled the statute of limitations between April 24, 1996, when AEDPA became effective, and April 24, 1997. Respondent elected to simply address Petitioner's claims on the merits. Petitioner subsequently moved for an evidentiary hearing and appointment of counsel. The Court granted Petitioner's motions and referred the case to the magistrate judge for an evidentiary hearing and a report and recommendation on Petitioner's eleventh claim that trial counsel was ineffective during plea negotiations. ECF No. 44. Following the evidentiary hearing, the magistrate judge

recommended that the Court grant the writ of habeas corpus. ECF No. 71. The Court rejected the magistrate judge's report and recommendation and denied relief on habeas claim eleven. ECF No. 74.

This matter is now before the Court on Petitioner's remaining claims and on his motion for summary judgment, which he filed on March 17, 2014. Although Respondent argues that some of the claims are unexhausted or procedurally defaulted, neither the failure to exhaust state remedies, nor a procedural default, are jurisdictional limitations, *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir. 2009), and Petitioner's claims do not warrant habeas relief. Given the history of this case, the perspective that a "cause-and-prejudice analysis adds nothing but complexity to the case," is most appropriate. *Babick v. Berghuis*, 620 F.3d 571, 576 (6th Cir. 2010). The Court therefore will go directly to the merits of Petitioner's claims, using the following standard of review.

## II.

The statutory authority of federal courts to grant habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The text of § 2254 provides in pertinent part:

**(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

**(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

**(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II).

"AEDPA . . . imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010). Although § 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings," it authorizes issuance of the writ only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 786 (2011). "If this standard is difficult to meet," the Supreme Court cautions, "that is because it was meant to be." *Id*.

The Michigan Court of Appeals issued a reasoned decision on Petitioner's first, third, fourth, and fifth claims, but the other state court decisions provide little or no reasoning to review, and some claims apparently were not raised in any state appellate court. Despite the limited reasoning to review,

> the Supreme Court has made clear that AEDPA deference applies even where the state courts have provided no reasoning. *Cullen v. Pinholster*, —— U.S. ——, 131 S. Ct. 1388, 1402, 179 L. Ed.2d 557 (2011). In such cases, [courts] must determine what arguments *could have* supported the state court decision and then determine whether reasonable jurists could disagree. *Pinholster*, 131 S.Ct. at 1402. This is a "modified form of AEDPA deference," in which the court focuses

on the result rather than the reasoning of the state court.  *Hawkins v. Coyle*, 547
F.3d 540, 546 (6th Cir. 2008).

*Peoples v. Lafler*, 734 F.3d 503, 516-17 (6th Cir. 2013) (emphasis original).   With these
considerations in mind, the Court proceeds to address Petitioner's claims.

A.

1.

In his first habeas claim, Petitioner alleges that it was reversible error for the state trial
court to (1) deny his request for a "hung jury" charge and (2) instruct the jurors that they may
consider involuntary manslaughter only upon finding that Petitioner was not guilty of the
principal charge of second-degree murder.  The record does not reflect that Petitioner requested a
"hung jury" charge.  Petitioner alleges in his reply brief that his objection to the "acquittal first"
jury instruction had the same effect as a valid request for a "hung jury" instruction.  Even if this
were true, the record fails to show that the jury was unable to reach a decision.  Petitioner's claim
that the trial court denied his request for a "hung jury" charge is without merit.

The remaining question is whether Petitioner's constitutional rights were violated by the
trial court's instruction that the jurors could consider the lesser included offense of manslaughter
only if they first found Petitioner not guilty of the charged offense (second-degree murder).
Petitioner claims that the instruction was coercive and unduly restrictive.

Petitioner raised this issue on direct appeal where the two-judge majority stated that,
although the trial court initially erred in its instructions to the jury, the jurors "were neither
expressly or impliedly coerced to reach a unanimous agreement of innocence of second-degree
murder before they were at liberty to consider the lesser offense of manslaughter." *Ambrose*,
Mich. Ct. App. No. 49968, at 3.  The Court of Appeals concluded that the jury was not confused
by the instructions and that Petitioner's conviction was untainted by any instruction coercion.

- 10 -

2.

"[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).  To prevail on his claim, Petitioner must show that "the ailing instruction itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Id*. at 146-47.  "If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Middleton v. McNeil*, 541 U.S. at 437 (quotation marks and end citations omitted).

The trial court initially instructed the jurors that they could discuss the lesser-included offense of manslaughter only if they found Petitioner not guilty of second-degree murder.  The disputed instruction reads:

> If you find the Defendant not guilty of Second Degree Murder as charged, then it is your obligation to consider the lesser included offense of Manslaughter, and to that charge your verdict can be guilty or not guilty.  But I want you to understand the verdict – you only have a verdict – discuss of (sic) a verdict of Manslaughter if the verdict with respect to the crime charged is not guilty.
>
> So, we'll give you a sheet of paper listing the crime charged in a box; your verdicts, guilty or not guilty.  If not guilty, then consider the lesser included offense of Manslaughter; will be guilty or not guilty.

Trial Tr. Vol. III, 435-36, Nov. 19, 1979.

The instruction was inaccurate under Michigan law  because it suggested that the jury had to find the defendant not guilty on the greater charge before it considered the lesser included offense. *People v. Mays*, 288 N.W.2d 207, 208 (1980) (*per curiam*).  Nevertheless, after a brief discussion with the attorneys off the record, the trial court stated that it had erred and that the only two offenses under consideration were murder in the second degree and the lesser-included

offense of manslaughter.  The court said that the jury could find Petitioner not guilty or guilty of one or the other offense.  Trial Tr. Vol. III, 436, Nov. 19, 1979.  Then, after excusing the alternate jurors, the court said:

> ladies and gentlemen, the verdicts that I've given to you will be given to you on a piece of paper.  *You discuss them in any order you care to*, but when you're ready, . . . mark them on a slip of paper that will be provided to you and have your foreman hand it to the bailiff . . . in whose hands you will be placed.

*Id*. at 437 (emphasis added).

And on the following day, the trial court once again said that the jurors could consider the three possible verdicts (not guilty, guilty of second-degree murder, or guilty of manslaughter) in any sequence.  Continuing, the court said:

> I think I initially said something to you in terms of the order.  I retracted that.  I wanted to make sure you understand that *you can consider the verdicts in any order [or] sequence you care to*.  That's your prerogative.
>
> [T]he three possible verdicts are, one, not guilty; two, guilty as charged, Second Degree Murder; three, guilty, Manslaughter.  All right.  Thank you.  That's it.

Trial Tr. Vol. IV, 454, Nov. 20, 1979 (emphasis and alterations added).

The record, as summarized above, indicates that, although the trial court's initial instruction may have been erroneous, the court corrected itself and correctly informed the jurors that they could consider the offenses in any order.

Petitioner nevertheless claims that the trial court subsequently repeated its error when the jurors asked to be re-instructed on second-degree murder and manslaughter, and the court said:

> If the evidence does not convince you beyond a reasonable doubt that the Defendant intended to kill, you must consider whether he acted with an unreasonable disregard for human life.  It is sufficient for Murder of the Second Degree if the Defendant consciously created a very high degree of risk of death, and if he had knowledge of the probability of those consequences.  However, if you find that the Defendant's acts did not amount to such a criminal purpose aimed against life, you must find the Defendant not guilty of Murder and consider whether or not he is guilty of Manslaughter.

- 12 -

*Id*. at 458-59.

It was not unreasonable for the Michigan Court of Appeals to conclude from this instruction that,

> [t]he trial court was instructing on the specific elements of the offense and, merely was making the point that all the elements of second-degree murder must be found before [the defendant] could be found guilty. At the most, the trial court was dealing with an order of consideration of the offenses and not instructing as to unanimity for acquittal.

*Ambrose*, Mich. Ct. App. No. 49968, at 4.

"It is not error to suggest an order of consideration of offenses." *People v. Mays*, 288 N.W.2d at 208. And because the trial court had previously stressed that the jury could consider the offenses in any sequence, there is not a reasonable likelihood that the jury applied the jury instructions in an unconstitutional manner. Petitioner therefore has no right to relief on the basis of his first claim.

## B.

The second habeas claim alleges that Petitioner is entitled to a new trial because he did not voluntarily, knowingly, and intelligently waive his constitutional right to a sworn jury. He also implies that his attorney was ineffective for advising him to waive the right and that both the trial court and attorneys were mistaken in thinking that the trial court's *nunc pro tunc* order was valid.

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Whether there was an intelligent waiver of a constitutional right "must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id*.

On the second day of Petitioner's trial after two witnesses had testified and a third witness had begun his testimony, the trial court pointed out to the jury and the parties that the jury had not been sworn. The court informed defense counsel that, if he had any objections, the court would immediately dismiss the jury and summon another panel. Defense counsel stated that he had discussed the matter with Petitioner and that they had no objection to proceeding with the current jury. Defense counsel asked the trial court to swear the jury *nunc pro tunc*. Trial Tr. Vol. II, 206, Nov. 16, 1979.

The trial court then addressed Petitioner and explained that a *nunc pro tunc* order meant an order is entered now as if it had been entered earlier. The court said that, if Petitioner had any objections to proceeding with the present jury, the court would honor his objections, dismiss the jury, and immediately call another panel. The court said, "[T]he choice is your[s]." *Id*. at 207-08. In response, Petitioner stated three times that he was satisfied with the jury, and he stated two times that he had no objections to continuing with the trial. He also declined the trial court's invitation to speak with his parents or spend additional time talking with his lawyer. *Id*. at 207-09.

Petitioner's responses indicate that his waiver of the right to dismiss the jury and start over with a new panel of jurors was voluntary, knowing, and intelligent. His willingness to have the trial court enter a *nunc pro tunc* order also was voluntary, knowing, and intelligent, and he has not shown that defense counsel's advice to continue with the jury as constituted prejudiced him. Consequently, he has no right to relief on the basis of his second claim.

C.

The third habeas claim alleges that the prosecutor unfairly impeached Petitioner at trial with his silence at the time of his arrest and after he was advised of his *Miranda* rights.[4] Michigan Court of Appeals Judge Riley provided the only reasoned discussion on this claim in her dissenting opinion on direct appeal.  She cited *Anderson v. Charles*, 447 U.S. 404 (1980) (*per curiam*), and concluded that there was no error in Petitioner's case because the prosecutor's questions related to omissions from the statement that Petitioner made to the police.

Petitioner's claim arose when he testified on direct examination by defense counsel that, on the night in question, he feared for his safety because he thought the victim was planning to rob him at gunpoint as the victim had done in the past.  Trial Tr. Vol. III, 323-24, Nov. 19, 1979. On cross-examination, the prosecutor accused Petitioner of fabricating the prior robbery.  The prosecutor then asked Petitioner three questions: (1) whether  he had told Officer Raymond Frank a different story;  (2) whether he had told Officer Frank that, during the robbery of two years ago neither the victim nor his companion had a gun; and (3) whether he had said that the only weapon used in the prior offense was a pipe.  *Id.* at 332.  In *Miranda*, the Supreme Court held that certain warnings must be given before a suspect's custodial statement may be admitted in evidence.  "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Miranda v. Arizona,* 384 U.S. at 444.

In *Doyle v. Ohio*, 426 U.S. 610, (1976), the Supreme Court considered a case involving two defendants who made no postarrest statements about their involvement in the crime.  Each testified at trial that he had been framed.  On cross-examination, the

_____

[4]  *See Miranda v. Arizona*, 384 U.S. 436 (1966).

- 15 -

prosecutor asked the defendant why they had not told the frameup story to the police upon arrest. [The Supreme Court] concluded that such impeachment was fundamentally unfair because *Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him.

*Anderson v. Charles*, 447 U.S. at 407-08 (footnote omitted).

Petitioner's case differs from *Doyle* in that Petitioner did not rely on the assurance that he would not be punished for exercising his right to remain silence. He waived his *Miranda* rights and voluntarily made a post-arrest statement to the police. Trial Tr. Vol. III, 300, Nov. 19, 1979. "[A] defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson v. Charles*, 447 U.S. at 408. And "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements." *Id*.

Petitioner nevertheless asserts that impeaching him with the omissions in his prior statement to Officer Frank violated his right to say only so much as he chose to say without penalty. But the Supreme Court concluded in *Anderson v. Charles* that, while "[e]ach of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version," "*Doyle* does not require any such formalistic understanding of 'silence.'" *Id*. at 409.

Petitioner also claims that the prosecutor's questions and arguments went beyond proper impeachment with prior inconsistent statements. For example, the prosecutor elicited testimony from Officer Frank on rebuttal that Petitioner did not mention anything about the victim being armed either during the incident two years earlier or during the incident on April 17, 1979. Trial Tr., Vol. III, 355, 358, Nov. 19, 1979. And, in his closing arguments, the prosecutor suggested that Petitioner had recently fabricated his defense of self-defense because Petitioner never

mentioned to the police that he thought the victim had a weapon on the night in question. *Id*. at 386, 409, 415.

The prosecutor did not imply that Petitioner had remained silent during his interview with Officer Frank. Instead, the prosecutor contrasted Petitioner's trial testimony with his pretrial statement to Officer Frank. He was suggesting that, if Petitioner's trial testimony about the victim having a weapon were true, he would have mentioned that fact to Officer Frank. *Doyle* does not bar a prosecutor from raising the possibility of recent fabrication by inquiring about a defendant's post-arrest statement and his failure to give the police the same explanation as the one he gave at trial. *United States v. Childs*, 539 F.3d 552, 562 (6th Cir. 2008). Petitioner therefore has no right to relief on the basis of his *Doyle* claim.

## D.

The fourth habeas claim reiterates Petitioner's claim about the prosecutor's alleged use of Petitioner's silence. Petitioner also alleges that his trial attorney was ineffective for failing to object to the prosecutor's comments regarding omissions in Petitioner's post-arrest statement. Finally, Petitioner alleges that the prosecutor improperly encouraged juror identification with the victim by pointing out that Petitioner did not check on the victim's condition after the assault.

## 1.

For the reasons given in the discussion on Petitioner's third claim, the prosecutor did not improperly question Petitioner and Officer Frank about omissions in Petitioner's pretrial statement to Officer Frank. For Petitioner to prevail on his claim that defense counsel was ineffective for failing to object to the prosecutor's conduct, Petitioner must demonstrate that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Unless a defendant makes both showings,

it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id*.

An attorney's performance is deficient if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. But "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689.

To demonstrate that an attorney's deficient performance prejudiced the defense, the defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. The petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693).

Having resolved in the discussion above that the prosecutor's impeachment of Petitioner with his prior statement to the police was proper. Defense counsel was not ineffective for failing to object to the remarks. An attorney is not ineffective for failing to make a meritless objection. *Hoffner v. Bradshaw*, 622 F.3d 487, 509 (6th Cir. 2010).

2.

The remaining question is whether the prosecutor improperly asked Petitioner whether he had checked on the victim's condition during the victim's two-week hospitalization. Trial Tr. Vol. III, 348-49, Nov. 19, 1979. Judge Riley was the only judge to issue a decision addressing this issue, and although she opined that the prosecutor's questions were improper, she did not recommend reversal.

- 18 -

Comments that encourage juror identification with crime victims are improper. *Wogenstahl v. Mitchell*, 668 F.3d 307, 333 (6th Cir. 2012)(quoting *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008)), *cert. denied* __ U.S. __, 133 S. Ct. 31 (2012).  In this case, however, defense counsel objected to the questions as being irrelevant and immaterial, and the trial court sustained the objection.  Trial Tr. Vol. III, 349, Nov. 19, 1979.

Furthermore, although the prosecutor's remarks obviously were intentional, the evidence against Petitioner was strong, and the prosecutor's remarks were not extensive.  In addition, defense counsel pointed out during closing arguments that the last thing Petitioner wanted to do after escaping from what he thought was a dangerous situation was to have contact with the victim.  *Id.* at 402.  Thus, even assuming that the prosecutor's comments were improper, they were not flagrant, and Petitioner has no right to relief on the basis of his fourth claim.

## E.

The fifth habeas claim alleges that the trial court infringed on Petitioner's right to cross-examine Officer Raymond Frank by not permitting Petitioner to question Officer Frank about Petitioner's pretrial statement to Officer Frank.  Michigan Court of Appeals Judge Riley said in her dissenting opinion on direct review that the trial court correctly precluded defense counsel's cross-examination of the arresting officer.  Judge Riley opined that Petitioner's exculpatory statement to Officer Frank – that he acted in self defense – was hearsay.  And she found no merit in Petitioner's claim that the statement was improperly introduced on rebuttal.

The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees an accused the right "to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  This right "includes the right to cross-examine witnesses."  *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (citing *Pointer v. Texas*, 380 U.S. 400, 404, 406-07 (1965)).  Trial

courts, however, have discretion to limit the scope of cross-examination. *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

The alleged interference with Petitioner's right of cross-examination occurred when defense counsel attempted to ask prosecution witness Raymond Frank about Petitioner's pretrial statements to Frank. The prosecutor objected on the ground that Petitioner's statement was hearsay[5] and that defense counsel could not bolster Petitioner's anticipated testimony by eliciting evidence that Petitioner made a prior consistent statement. After a lengthy discussion on the issue in the jury's absence, the trial court sustained the prosecutor's objection. Trial Tr. Vol. III, 300-315, Nov. 19, 1979.

Petitioner subsequently testified, and the prosecutor then recalled Officer Frank as a rebuttal witness. Officer Frank testified on rebuttal that Petitioner never mentioned anything about the victim having a gun, either during the incident that occurred two years earlier or during the incident on April 17, 1979. *Id*. at 355.

Petitioner was not prevented from cross-examining Officer Frank, and "[w]here it is merely the *extent* of cross-examination that is limited, the trial judge retains a much wider latitude of discretion . . . ." *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989). The test in those circumstances "is whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory." *Id*.

The jury was able to assess the defense theory despite the limitations placed on Petitioner's cross-examination of Officer Frank, because Petitioner testified in his own defense. And when Officer Frank testified on rebuttal, defense counsel was given an opportunity to cross-examine him about Petitioner's statement to Officer Frank. Defense counsel was permitted to

---

[5] Petitioner had not yet testified when defense counsel tried to elicit what Petitioner said in his interviews with Officer Frank.

elicit testimony that, during Petitioner's pretrial statements to Officer Frank, Petitioner had informed Officer Frank that:  the victim robbed him two years earlier and took $5.00 from him; he (Petitioner) thought the victim had said, "Give me some money" on  April 17, 1979; and  he (Petitioner) decided to fight with the victim after the victim grabbed his wrist, because he wanted to "get" the victim before the victim got him. Trial Tr. Vol. III, 357, 361, Nov. 19, 1979.

The jury received enough information, despite the limits placed on defense counsel's cross-examination of Officer Frank during the prosecutor's case in chief to assess the defense theory.  The prosecutor, moreover, did not err by calling Officer Frank as a rebuttal witness to impeach Petitioner's testimony that the victim had a weapon on the prior occasion when Petitioner supposedly was robbed or on the night in question when Petitioner beat the victim. *People v. Dyson*, 307 N.W.2d 739, 740-42 (Mich. Ct. App. 1981).

F.

The sixth habeas claim alleges that the magistrate who presided over the reverse writ proceedings in state court was not neutral or detached.  In support of this contention, Petitioner claims that the magistrate suspended his constitutional right to the writ of habeas corpus by appointing Police Officer Raymond Frank to represent him during the reverse writ proceedings. Petitioner asserts that Officer Frank used confidential information obtained during the reverse writ proceeding in his testimony against Petitioner at trial.  Petitioner makes the same argument in his pending motion for summary judgment.

An exhibit to the habeas petition lists Petitioner as a respondent in the reverse writ of habeas corpus proceedings, and it names Officer Frank under a column labeled "attorney for respondent."  ECF No. 2, Appendix C.  But the preceding paper states that Petitioner did not have an attorney during the reverse writ proceedings, and another exhibit indicates that Officer Frank was the complaining witness in the proceedings.   ECF No. 2, Appendix D.  Thus,

- 21 -

Petitioner is mistaken when he claims that Officer Frank was his attorney during the reverse writ proceedings. And because the reverse writ proceedings had no bearing on Petitioner's trial and conviction, he has no right to relief in federal court on the basis of alleged irregularities in the reverse writ proceedings. The Court declines to grant relief on habeas claim six. The Court also denies Petitioner's motion for summary judgment, which raises the same issue.

G.

The seventh habeas claim alleges that the trial court failed to consider whether Petitioner's actions as the aggressor entitled him to assert the qualified right to self-defense. Petitioner also contends that defense counsel made an improper objection to the court's instructions.

The record indicates that the trial court did consider and instruct the jury on the relationship between an aggressor's actions and the right to defend oneself. The court gave a thorough instruction on self-defense and informed the jury that

> [a] person who begins an assault upon another with deadly force cannot claim the right of self-defense unless he has withdrawn from the fight in good faith and clearly informed the other person of his desire for peace and an end to the fight. If the other person continues the assault or resumes it at a later time, the Defendant has the same rights of self-defense as any other person and is justified in using force to save himself from imminent bodily harm.
>
> A person who assaults another with fists or a non-deadly weapon does not lose his right of self-defense by such actions and, if assaulted with a deadly weapon, may lawfully act in self-defense.

Trial Tr. Vol. III, 432, Nov. 19, 1979.

This apparently was not the precise instruction that Petitioner wanted, but, contrary to his allegations, defense counsel made a specific objection to the instruction. Defense counsel suggested that the trial court should have said, "If [the jurors] find the Defendant was the aggressor in the affray, then the defense of self-defense cannot be open to [him]." *Id*. at 442.

The fact that defense counsel couched his objection in terms of "suggesting" that the jury be told the defense of self-defense is not open to the aggressor of the affray does not mean the objection was not specific.  The obvious reason for the use of the word "suggest" is that, when defense counsel objected, the trial court said, "Have you any suggestion?"  *Id*.  And even though defense counsel went on to say, "I don't think . . . at this point, any instruction the Court is going to give is going to help ," *id*. at 443, counsel apparently speculated that a supplemental instruction on the issue would hurt Petitioner more than help him.

Any deficiency in the instruction on self-defense could not have prejudiced Petitioner in any event, because he did not claim to be the aggressor in the confrontation with the victim.  He testified that the victim began the assault by coming from behind him, grabbing his wrist, shoving his arm up, demanding some money, and verbally abusing him.  He also claimed that he hit the victim because the victim appeared to be reaching for a weapon. *Id*. at 324-25.

The trial court's jury instruction on self-defense was adequate under the circumstances, and defense counsel's actions or inactions did not prejudice the defense.  Petitioner has no right to relief on the basis of his claims about the jury instruction on self-defense and defense counsel's objection to the instructions.

## H.

The eighth claim alleges that the trial court erred by denying Petitioner's request for an adequate instruction on gross negligence during the court's supplemental instructions.  Petitioner maintains that the requested instruction was not substantially covered by other instructions and that the court's denial of his request to re-instruct on gross negligence impaired his theory of defense.

Petitioner is not entitled to relief on his claim about the jury instructions unless "the ailing instruction itself so infected the entire trial that the resulting conviction violates due

process." *Cupp v. Naughten*, 414 U.S. at 147. "Petitioner must show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair." *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000) (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

At issue here is the trial court's failure to instruct on gross negligence when the deliberating jury asked to be re-instructed on second-degree murder and involuntary manslaughter. Gross negligence was the underlying theory for the lesser-included offense of involuntary manslaughter, and, after the trial court re-instructed the jury on second-degree murder and manslaughter, defense counsel stated that the court also should have instructed the jury on gross negligence. Trial Tr. Vol. IV, 455-61, Nov. 20, 1979.

The trial court did say during its supplemental jury instruction that to establish the crime of manslaughter, the prosecution had to prove, among other things,

> that when [the defendant] did the act which caused death, the Defendant must have been committing an unlawful act which was inherently and naturally dangerous to human life, that is, an act which was grossly negligent to human life.

*Id*. at 459.

Although the trial court did not define "gross negligence" when it gave this instruction, it did  define "gross negligence" during its initial charge to the jury. Trial Tr., Vol. III, 443-44, Nov. 19, 1979. Furthermore, gross negligence was not Petitioner's defense theory, and, after being re-instructed on second-degree murder and manslaughter, the jurors assured the trial court that it had answered their question. Trial Tr., Vol. IV, 459, Nov. 20, 1979. The prosecutor, moreover, reasonably pointed out that the jury apparently did not need definitions during the re-instructions and was only interested in the elements of the crimes. *Id*. at 460. Petitioner, therefore, has no right to relief on the basis of his claim that the trial court impaired his theory of the defense and did not adequately state the law on gross negligence.

- 24 -

I.

Petitioner contends in his ninth claim that he and his trial attorney were absent when a juror asked for a written copy of the jury instructions on second-degree murder and manslaughter. Petitioner claims that, due to his and his attorney's absence at the time, he was denied notice and an opportunity to respond to the juror's request. Petitioner further alleges that the trial court violated 28 U.S.C. § 753(b) when it failed to transcribe the court proceeding that resulted from the juror's request for written jury instructions.

Section 753(b) states that court proceedings must be recorded verbatim. Petitioner's reliance on § 753(b) is misplaced because the statute applies to federal court proceedings. As such, it has no relevance to Petitioner's trial in Detroit Recorder's Court. Furthermore, there is no constitutional right to have a court reporter transcribe every communication between a judge and a juror. *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (quoting *Rushen v. Spain*, 464 U.S. 114, 125-26 (1983) (Stevens, J., concurring)).

The remaining question is whether Petitioner was denied his right to be present and to have his attorney present at a critical stage of his trial.

> The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, *e.g., Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), but [the Supreme Court has] recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him. In *Snyder v. Massachusetts*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), the Court explained that a defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge . . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id.*, at 105-106, 108, 54 S.Ct., at 332, 333; see also *Faretta v. California*, 422 U.S. 806, 819, n. 15, 95 S.Ct. 2525, 2533, n. 15, 45 L.Ed.2d 562 (1975). The Court also cautioned in *Snyder* that the exclusion of a defendant from a trial proceeding should be considered in light of the whole record. 291 U.S., at 115, 54 S.Ct., at 335.

*United States v. Gagnon*, 470 U.S. at 526-27.  When it is defense counsel who was absent, a defendant need not show prejudice if counsel was absent at a critical stage of the proceedings. *United States v. Cronic*, 466 U.S. 648, 658-59 & 659 n. 25 (1984).

The record before the Court indicates that Petitioner's jury was excused for lunch at 12:36 p.m. on November 20, 1979.  The next entry in the record is the jury's verdict at 4:15 p.m. that day.  Trial Tr. Vol. IV, 462, Nov. 20, 1979.  Exhibits to the habeas petition, however, indicate that the jury sent the following note to the trial court at 3:17 p.m. on November 20, 1979:

> One person would like to have the law on murder 2nd degree & manslaughter. Can we have a copy for this person.

ECF No. 2, App. F.

Petitioner maintains that his attorney must have been absent when the deliberating jury made this request, because defense counsel indicated immediately before the lunch break that he was needed in another courtroom.  Trial Tr. Vol. IV, 461, Nov. 20, 1979.  But the record is silent as to whether the trial court responded to the jury's note, and if the court did respond, whether Petitioner and his attorney were present or absent at the time.  Even if the trial court responded to the jury's note and both Petitioner and his attorney were absent at the time, there is no reason to believe that the trial court did anything other than provide the jury with a copy of the instructions it had previously read to the jury while Petitioner and his attorney were present.  This conclusion is bolstered by the fact that the trial court previously assured Petitioner that his attorney had to be present if a legal question arose during the jury's deliberations.  Trial Tr. Vol. III, 448, Nov. 19, 1979.  Although

> certain instances of jury re-instruction and the reading of supplemental instructions qualify as critical stages of a trial, *see, e.g., Valentine v. United States*, 488 F.3d 325, 335 (6th Cir. 2007); *Caver v. Straub*, 349 F.3d 340, 350 (6th Cir. 2003), the re-reading of identical jury instructions does not.  *See Hudson*

> [*v. Jones*, 351 F.3d 212, 217 (6th Cir. 2003)].  Providing the jury with a written
> copy of instructions that have already been delivered orally is not a critical phase
> of a trial.

*Phillips v. Bradshaw*, 607 F.3d 199, 224 (6th Cir. 2010).  It falls more in the category of an

administrative communication, one that is "outside of the class of 'critical stage' jury instructions

that subjects a defendant to prejudice if made without counsel."  *Peoples v. Lafler*, 734 F.3d at

519 (citing *Coleman v. Alabama*, 399 U.S. 1, 9 (1970)).

To conclude, the disputed incident was not a critical stage of Petitioner's trial.  Therefore,

even if the trial court responded to the jury's note in Petitioner's and his attorney's absence,

prejudice is not presumed.  *Hudson v. Jones*, 351 F.3d at 218.  And because Petitioner has not

demonstrated that actual prejudice occurred, he has no right to relief.

## J.

Petitioner's final two claims allege that his trial attorney was ineffective during closing

arguments  and at sentencing.  As previously explained, an attorney is constitutionally ineffective

if his or her performance was deficient and the deficient performance prejudiced the defense.

*Strickland v. Washington*, 466 U.S. at 687.

> A fair assessment of attorney performance requires that every effort be made to
> eliminate the distorting effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct from counsel's
> perspective at the time.  Because of the difficulties inherent in making the
> evaluation, a court must indulge a strong presumption that counsel's conduct falls
> within the wide range of reasonable professional assistance; that is, the defendant
> must overcome the presumption that, under the circumstances, the challenged
> action "might be considered sound trial strategy."  See *Michel v. Louisiana*, [350
> U.S. 91, 101 (1955)].  There are countless ways to provide effective assistance in
> any given case.  Even the best criminal defense attorneys would not defend a
> particular client in the same way.

*Id.*  at 689.

1.

Petitioner contends that his attorney should have argued a theory of gross negligence during closing arguments because that was the underlying theory for the lesser-included offense of manslaughter. It was the prosecutor, however, who requested a jury instruction on manslaughter. Trial Tr. Vol. III, 438-40, 444-45, Nov. 19, 1979. Defense counsel chose to argue that Petitioner was not guilty of either second-degree murder or manslaughter because Petitioner acted in self-defense and he may not have been the cause of death. This strategy was reasonable given (1) Petitioner's testimony that he feared the victim was reaching for a weapon and was planning to rob him as he had done in the past and (2) medical testimony that the victim abused drugs, that his injuries were complicated by bronchial pneumonia, and that the victim succumbed to infection while hospitalized. Therefore, defense counsel was not ineffective for failing to argue gross negligence in his closing argument.

2.

Petitioner's twelfth and final claim alleges that his trial attorney was ineffective for failing to object when the trial court sentenced him to life imprisonment.

Petitioner relies on Mich. Comp. Laws § 769.8(1), which reads:

When a person is convicted for the first time for committing a felony and the punishment prescribed by law for that offense may be imprisonment in a state prison, the court imposing sentence shall not fix a definite term of imprisonment, but shall fix a minimum term, except as otherwise provided in this chapter. The maximum penalty provided by law shall be the maximum sentence in all cases except as provided in this chapter and shall be stated by the judge in imposing the sentence.

Simply stated, "first-time felony offenders are required to be given an indeterminate sentence . . . ." *Shaya v. Holder*, 586 F.3d 401, 406 (6th Cir. 2009).[6]

---

[6]

Despite the language in § 769.8(1) suggesting that courts set a minimum and maximum term of imprisonment for first-time felony offenders, the statute allows for an exception "as otherwise provided in this chapter."  The next statute in the chapter reads:

> (2) In all cases where the maximum sentence in the discretion of the court may be imprisonment for life or any number or term of years, the court may impose a sentence for life or may impose a sentence for any term of years.  If the sentence imposed by the court is for any term of years, the court shall fix both the minimum and the maximum of that sentence in terms of years or fraction thereof, and sentences so imposed shall be considered indeterminate sentences.  The court shall not impose a sentence in which the maximum penalty is life imprisonment with a minimum for a term of years included in the same sentence.

Mich. Comp. Laws § 769.9(2).  In other words, "no minimum term of years may be set when life is the maximum . . . ."  *People v. Penn*, 302 N.W.2d 298, 299 (Mich. Ct. App. 1981).

The maximum sentence for second-degree murder is life imprisonment "or any term of years," in the discretion of the court trying the case.  Mich. Comp. Laws § 750.317.  The state trial court imposed a sentence of life imprisonment in Petitioner's case.  Under § 769.9(2), no minimum term of years could be set because the trial court did not sentence Petitioner to a term of years for the maximum sentence.  Thus, defense counsel's failure to object to the sentence did not amount to deficient performance.

Even if counsel's performance was deficient, it does not appear that the deficient performance prejudiced Petitioner.  Defense counsel argued that Petitioner should not be punished for the rest of his life because this was his first contact with the law, he was remorseful,

---

An indeterminate sentence is one 'of an unspecified duration, such as one for a term of 10 to 20 years.' Black's Law Dictionary (8th ed.).  In other words, while a defendant may serve a sentence of up to 20 years, the defendant may be released from prison at the discretion of the parole board at any time after the defendant serves the ten-year minimum.

*People v. Drohan*, 715 N.W.2d 778, 786 n.10 (Mich. 2006).   Under Michigan's sentencing scheme, "the defendant is given a sentence with a minimum and a maximum. The maximum is not determined by the trial judge but is set by law.  M.C.L. § 769.8.  The minimum is based on guidelines ranges . . . ."  *People v. Claypool*, 684 N.W.2d 278, 286 n. 14 (Mich. 2004).

and he was still a young man.   Sentencing Tr., 2-3, Dec. 7, 1979.  The trial court nevertheless stated that it had never seen a crime like Petitioner's, despite the court's legal experience as a prosecutor for thirteen years, a defense attorney for eleven years, and a judge for a few months. The trial court also said that Petitioner caused him more concern than anyone else the court had sentenced.  *Id.* at 3-4.

In light of the trial court's remarks, there is not a substantial probability that, but for defense counsel's failure to object to the life sentence, the result of the proceeding would have been different.  Defense counsel's conduct did not prejudice Petitioner, and Petitioner has no right to relief on the basis of his claim of ineffective assistance of counsel.

### III.

On March 17, 2014, Petitioner filed a motion for summary judgment that reiterates the same arguments he makes in his habeas petition. *See* Mot. for Summ. J., ECF No. 79. As explained above, those arguments are meritless. Accordingly, Petitioner's motion for summary judgment will be denied.

### IV.

Petitioner may appeal the denial of his habeas petition only if a district or circuit judge issues a certificate of appealability.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  When, as here, "a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:

The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. at 484.

Reasonable jurists would not find the Court's assessment of Claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 12 debatable or wrong, nor conclude that the issues are adequate to deserve encouragement to proceed further. Accordingly, a certificate of appealability will be denied as to those claims.

However, reasonable jurists could find the Court's assessment of Petitioner's eleventh claim debatable, *see* ECF No. 74, and therefore the Court will grant Petitioner a certificate of appealability and permission to proceed *in forma pauperis* on appeal.

V.

Accordingly, it is **ORDERED** that the Petition for Writ of Habeas Corpus (ECF No. 1) is **DENIED**.

It is further **ORDERED** that Petitioner's Motion for Summary Judgment (ECF No. 79) is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **GRANTED** in part because jurists of reason could debate the Court's assessment of Petitioner's eleventh claim, which alleges that his trial counsel failed to inform him of an offer for a plea agreement. The Court declines to grant a certificate of appealability on Petitioner's remaining claims because those claims do not deserve encouragement to proceed further.

It is further **ORDERED** that leave to proceed *in forma pauperis* on appeal is **GRANTED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 31, 2014

- 31 -

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney of record herein by electronic means and on Samuel Lee Ambrose, No. 159367, at Bellamy Creek Correctional Facility, 1727 West Bluewater Highway, Ionia, MI 48846 by first class U.S. mail on March 31, 2014.

s/Tracy A. Jacobs
TRACY A. JACOBS